TERRY B. LIVENGOOD ET AL., ON BEHALF OF THEMSELVES AND
ALL OTHER MEMBERS OF THE NEBRASKA STATE PATROL EMPLOYED
ON OR BEFORE JANUARY 4, 1979, APPELLEES AND CROSS-APPELLANTS,
v. NEBRASKA STATE PATROL RETIREMENT SYSTEM ET AL.,
APPELLANTS AND CROSS-APPELLEES.

729 N.W.2d 55

Filed March 23, 2007.   No. S-05-710.

Jon Bruning, Attorney General, and Fredrick F. Neid for appellants.

Vincent Valentino, of Angle, Murphy, Valentino & Campbell, P.C., for appellees.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

In *Halpin v. Nebraska State Patrolmen's Retirement System*,[1] we determined that Nebraska State Patrol officers employed before January 4, 1979, are entitled to receive payments for unused sick leave accumulated during their last 3 years of employment included in their retirement annuities. When we decided *Halpin*, State Patrol officers received 240 hours of sick leave per year under Nebraska statute. Later, a labor agreement reduced the sick leave hours from 240 to 108. The officers sued the appellants, alleging that the appellants could not change sick leave hours included in the officers' retirement calculation.

This case requires us to decide two questions: (1) whether reducing the amount of sick leave implicates a retirement program, which cannot be bargained under Neb. Rev. Stat. § 81-1377(2) (Reissue 1999), and (2) whether by reducing sick leave hours, the appellants unconstitutionally impaired the officers' contract rights in their retirement benefits. The district court found that by reducing sick leave included in officers' retirement annuities, the State bargained a retirement program, which is prohibited under § 81-1377(2). We reverse, because the number of sick leave hours included in the calculation is not a retirement program and the State did not impair the officers' contractual rights.

## I. BACKGROUND

The appellees are retired law enforcement officers of the Nebraska State Patrol (hereinafter the Officers) who were employed on or before January 4, 1979, and retired on or after July 1, 1993. When the Nebraska State Patrol hired the Officers, it provided them with information about the benefits they would

---

[1] *Halpin v. Nebraska State Patrolmen's Retirement System*, 211 Neb. 892, 898, 320 N.W.2d 910, 914 (1982).

receive upon retirement. The Officers received a schedule of paid sick leave which provided that beginning in the 19th year of employment, they would earn 240 hours, or 30 days, of sick leave each year—the same sick leave schedule as provided by Nebraska statute.[2] Nebraska State Patrol representatives told the Officers that upon retirement, they would receive a lump-sum payment for one-fourth of their unused sick leave balance for the last 3 years of their employment. In addition, the lump sum would be included in calculating their retirement annuity. With 240 sick leave hours per year, an officer could potentially accumulate 720 unused sick leave hours in his or her final 3 years of employment. One-fourth of 720 hours (180 hours) would then be multiplied by the officer's rate of pay to calculate his or her retirement annuity.

In 1987, the Legislature passed the State Employees Collective Bargaining Act.[3] The act allows state employees in designated bargaining units to collectively bargain with the state. The act established as one of the bargaining units the Law Enforcement Bargaining Unit. That unit represents, among others, officers of the Nebraska State Patrol.[4] Bargaining must take place over mandatory topics, except when specifically prohibited by law.[5] The act prohibits the State and bargaining units from bargaining over retirement programs.[6]

In 1993, the Law Enforcement Bargaining Unit entered into a contract with the State of Nebraska that changed the sick leave provision. The contract provided that all employees would receive a flat 108 sick leave hours per year, instead of a graduated scale peaking at 240 hours per year in the 19th year of employment. Consequently, the Officers now earn only 324 hours of sick leave in their last 3 years of employment. The Nebraska State Patrol Retirement System uses 324 hours in calculating the Officers' retirement annuities. Under the new contract, then, officers can have, at most, 81 sick leave hours (one-fourth of 324 hours)

---

[2] See Neb. Rev. Stat. § 81-1320 (Reissue 1999).

[3] Neb. Rev. Stat. §§ 81-1369 to 81-1390 (Reissue 1999).

[4] § 81-1373(1)(g).

[5] § 81-1371(9).

[6] § 81-1377(2).

included for purposes of calculating their annuities compared to 180 hours under the previous sick leave provision.

The Officers sued the Nebraska State Patrol Retirement System, the Public Employees Retirement Board, the State of Nebraska, and Anna Sullivan, director of the Public Employees Retirement Board, in her official capacity (hereinafter collectively the Appellants). The Officers sought a declaration that their retirement annuities had been miscalculated. The district court determined that 240 sick leave hours per year included in the annuity, as first represented to the Officers, is an integral part of their retirement program. Therefore, the court found that the State and the Law Enforcement Bargaining Council violated § 81-1377(2) by bargaining a retirement program. The court entered a declaratory judgment against the Appellants, ordering the retirement benefits to be recalculated on 240 sick leave hours per year instead of 108 hours under the contract.

## II. ASSIGNMENTS OF ERROR

The Appellants assign that the district court erred in (1) ruling that Neb. Rev. Stat. § 25-21,206 (Reissue 1995) authorizes the jurisdiction of the court over a declaratory action against the Appellants instituted directly in the district court, (2) finding the requirements of the Administrative Procedure Act inapplicable, (3) concluding that a representative suit may be brought in district court against the Appellants, (4) ruling that the Officers are not bound by the provisions of the State Law Enforcement Bargaining Council contracts limiting officers' accumulation of sick leave to 324 hours in the last 3 years of employment, and (5) granting affirmative relief against the Appellants.

On cross-appeal, the Officers assign that the district court erred in (1) limiting the class to members retiring after May 9, 2000, and (2) failing to award attorney fees under the common fund doctrine.

## III. STANDARD OF REVIEW

The question of jurisdiction is a question of law, which we resolve independently of the trial court.[7]

---

[7] See *Metropolitan Util. Dist. v. Aquila, Inc.*, 271 Neb. 454, 712 N.W.2d 280 (2006).

■ Statutory interpretation is a question of law, which we resolve independently of the trial court.[8]

## IV. ANALYSIS

### 1. THE STATE WAIVED SOVEREIGN IMMUNITY; THE DISTRICT COURT HAD JURISDICTION

#### (a) Presuit Filing Procedure

The Appellants argue that the district court did not have jurisdiction. The court, however, found that it had jurisdiction under § 25-21,206, which waives immunity in this dispute.

■ Under the Nebraska Constitution, "[t]he state may sue and be sued, and the Legislature shall provide by law in what manner and in what courts suits shall be brought."[9] This provision permits the State to lay its sovereignty aside and consent to be sued on such terms and conditions as the Legislature may prescribe.[10] It is not self-executing, however, but instead requires legislative action for waiver of the State's sovereign immunity.[11] Waiver of sovereign immunity will be found only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction.[12]

Under § 25-21,206, "[t]he state may be sued in the district court of the county wherein the capital is situated in any matter founded upon or growing out of a contract, express or implied, originally authorized or subsequently ratified by the Legislature, or founded upon any law of the state." The Appellants concede that this is a contractual dispute and that § 25-21,206 waives immunity. But they contend that jurisdiction is lacking even though immunity is waived under § 25-21,206. They argue that

---

[8] See *Young v. Midwest Fam. Mut. Ins. Co.*, 272 Neb. 385, 722 N.W.2d 13 (2006).

[9] Neb. Const. art. V, § 22.

[10] *Hoiengs v. County of Adams*, 245 Neb. 877, 516 N.W.2d 223 (1994).

[11] See *Riley v. State*, 244 Neb. 250, 506 N.W.2d 45 (1993).

[12] *Id.* Accord, *Johnson v. State*, 270 Neb. 316, 700 N.W.2d 620 (2005); *Concerned Citizens v. Department of Environ. Contr.*, 244 Neb. 152, 505 N.W.2d 654 (1993).

our case law requires that the Officers present their contract claims to legislatively designated state agencies or offices before judicial review.

### (i) The Officers Were Not Required to Present Their Claims to the Board

The Appellants argue that this lawsuit could not originate in district court but that instead, the Officers were required to initially present their claims to the Public Employees Retirement Board (hereinafter the Board). The claims would then be subject to judicial review under the Administrative Procedure Act.[13] The Appellants refer us to Neb. Rev. Stat. § 84-1503 (Supp. 2001), which establishes the duties of the Board. Section 84-1503(2) provides:

[I]t shall be the duty of the board:

. . . .

(g) To adopt and promulgate rules and regulations to carry out the provisions of each retirement system . . . .

. . . .

(i) To adopt and promulgate rules and regulations for the adjustment of contributions or benefits, which shall include, but not be limited to: (i) The procedures for refunding contributions, adjusting future contributions or benefit payments, and requiring additional contributions or repayment of benefits; (ii) the process for a member, member's beneficiary, employee, or employer to dispute an adjustment to contributions or benefits; and (iii) notice provided to all affected persons.

Under this section, the Board has adopted regulations regarding the initiation of and procedure for contested cases before the Board. The Appellants emphasize that the regulations and the Administrative Procedure Act allow for judicial review of Board decisions.[14] But neither § 84-1503 nor the regulations cited by the Appellants *mandate* that an aggrieved party present his or her claim to the Board before suing in court. We conclude that

---

[13] Neb. Rev. Stat. §§ 84-901 to 84-917 (Reissue 1999).

[14] See 303 Neb. Admin. Code, ch. 18, § 010.01, and ch. 12, §§ 008.01 to 008.03 (2001).

the Officers were not obligated to first present their claims to the Board.

### (ii) The Presuit Procedure Under § 81-1170.01
### Does Not Apply to the Officers' Claims

The Appellants also contend that the Officers' claims presented a request on the treasury subject to the requirements of Neb. Rev. Stat. § 81-1170.01 (Reissue 1999). That section provides in part, "All requests of whatever nature upon the treasury of this state, before any warrant is drawn for the payment of the same, shall be examined, adjusted, and approved by the Department of Administrative Services." This section would require that the Officers present their claims to the Department of Administrative Services (DAS) before suing in the district court. The Officers, however, argue that § 81-1170.01 is inapplicable to requests for retirement benefits under the statutory scheme of the Nebraska State Patrol Retirement Act.[15] We agree.

It is true that our case law has long indicated that a claimant bringing suit under § 25-21,206 must comply with the procedure under § 81-1170.01 before an action can be pursued in court. This court first examined the relationship between the antecedents to §§ 81-1170.01 and 25-21,206 in *The State v. Stout.*[16] In *Stout*, a case involving a dispute over a construction contract between the plaintiff and the State, we held:

> [T]he right to bring an original action against the state is denied, and . . . the only mode of procedure by which the court can acquire jurisdiction is by an appeal from the decision of the auditor and secretary of state [now the Department of Administrative Services], whose joint action is now required in the approval of claims.[17]

We have consistently upheld this holding for over 100 years.[18]

---

[15] Neb. Rev. Stat. §§ 81-2014 to 81-2040 (Reissue 1999 & Supp. 2001).

[16] *The State v. Stout*, 7 Neb. 89 (1878).

[17] *Id.* at 106.

[18] See, *J.L. Healy Constr. Co. v. State*, 236 Neb. 759, 463 N.W.2d 813 (1990); *VisionQuest, Inc. v. State*, 222 Neb. 228, 383 N.W.2d 22 (1986); *Scotts Bluff County v. State*, 133 Neb. 508, 276 N.W. 185 (1937); *Pickus v. State*, 115 Neb. 869, 215 N.W. 129 (1927).

The Officers, however, argue that this presuit filing require-
ment does not apply in disputes over retirement benefits between
the State and its employees. They point out that the *Stout* line of
cases all involved contracts with outside parties, making them
distinguishable from the present case. Instead, the Officers argue
that in retirement benefit controversies, § 25-21,206 provides a
waiver of immunity without this presuit filing requirement. In
support of this argument, they point to *Halpin v. Nebraska State
Patrolmen's Retirement System,*[19] *Omer v. Tagg,*[20] and *Hoiengs
v. County of Adams.*[21] Those actions started in district court.
*Halpin* and *Omer,* however, do not provide guidance. Although
both cases involved retirement benefits disputes, *Halpin* did not
discuss sovereign immunity.[22] And *Omer* held that § 25-21,206
waived immunity, but did not address whether § 81-1170.01
required presuit procedures.[23]

But in *Hoiengs,*[24] we did note the possibility that presuit pro-
cedures under § 81-1170.01 might apply. There, the plaintiffs
had filed a class action suit against the Retirement System for
Nebraska Counties under the County Employees Retirement Act,
alleging that they were not receiving the appropriate contribution
to their retirement accounts from the employer counties. We noted
that under § 81-1170.01, presentation of a claim to the DAS was
a "mandatory step" in contract actions.[25] However, in *Hoiengs,*
we determined that state claims procedure did not apply because
the plaintiffs sought contributions from the county, which would
not be a direct claim on the State Treasury.[26] And "[f]or that

---

[19] *Halpin v. Nebraska State Patrolmen's Retirement System, supra* note 1.

[20] *Omer v. Tagg,* 235 Neb. 527, 455 N.W.2d 815 (1990), *disapproved on other
grounds, Livingston v. Metropolitan Util. Dist.,* 269 Neb. 301, 692 N.W.2d
475 (2005).

[21] *Hoiengs v. County of Adams, supra* note 10.

[22] See *Halpin v. Nebraska State Patrolmen's Retirement System, supra* note 1.

[23] See *Omer v. Tagg, supra* note 20.

[24] *Hoiengs v. County of Adams, supra* note 10.

[25] *Id.* at 891, 516 N.W.2d at 235, citing *J.L. Healy Constr. Co. v. State, supra*
note 18.

[26] *Id.*

reason alone," the claims procedure under § 81-1170.01 was not implicated in *Hoiengs*.[27]

The Appellants attempt to distinguish *Hoiengs*, arguing that this case implicates § 81-1170.01 because the Officers' claims are against the State. That conclusion, however, assumes that the only reason § 81-1170.01 did not apply in *Hoiengs* was because the case involved a county. We now recognize that the procedure at issue is also inapplicable for a different reason— § 81-1170.01 does not apply to retirement disputes under our statutory scheme.

Our conclusion rests on the statutory provisions that govern the disbursement of money from the Nebraska State Patrol Retirement Fund, the fund from which the Officers' retirement benefits are paid.[28] The Nebraska State Patrol Retirement Act provides: "The State Treasurer shall be the custodian of the funds and securities of the retirement system . . . . The State Treasurer shall disburse money from [the Nebraska State Patrol Retirement Fund] only on warrants issued by the Director of the [DAS] *upon vouchers signed by a person authorized by the* [*Board*]."[29] Under this statute, the DAS cannot grant the Officers' request because it is not authorized to do so. Under § 81-2020, the Board must authorize disbursements from the Nebraska State Patrol Retirement Fund, so it would be futile for the Officers to present their claims to the DAS. Instead, this statute suggests that the Board, not the retirees, makes the request contemplated by § 81-1170.01 when retirement funds are involved.

■■ If the Officers were to present their claims to the DAS, the claims would be disallowed because the DAS has no authority to allow them without the Board's approval. It would be illogical to require such a superfluous step. If possible, we will try to avoid a statutory construction which would lead to an absurd result.[30] Thus, we hold that the presuit filing requirement under

---

[27] *Id.* at 892, 516 N.W.2d at 236.

[28] See § 81-2018(1).

[29] § 81-2020 (emphasis supplied).

[30] *Curran v. Buser*, 271 Neb. 332, 711 N.W.2d 562 (2006).

§ 81-1170.01, as interpreted by *Stout*,[31] is inapplicable in retirement benefits controversies. And, as discussed above, no other statute or regulation provides a mandatory presuit filing requirement applicable in this case. Therefore, the district court had jurisdiction.

### (b) Class Action

■ The Appellants argue that they are immune from class action suits. They rely on *Boersma v. Karnes*,[32] in which this court held that "[i]n the absence of specific statutory authority waiving governmental immunity to permit representative suits, class actions cannot be maintained to recover taxes paid." The Appellants contend that this rule—that there must be a specific waiver permitting class actions against the State—should apply here as well.

■ *Boersma* involved a class action lawsuit brought by taxpayers seeking a refund of taxes they claim the State of Nebraska incorrectly collected.[33] The plaintiffs initially filed for a refund with the Nebraska Tax Commissioner as required under Nebraska statutes.[34] After the Tax Commissioner denied their claim, they sued under Neb. Rev. Stat. § 77-2798 (Reissue 2003). That statute provides, "[A]ny taxpayer who claims that the income tax he has paid under the Nebraska Revenue Act of 1967 is void in whole or in part, may bring an action, upon the grounds set forth in his claim for refund, against the Tax Commissioner." In disallowing the class action, we recognized the established rule in this state that an action cannot be maintained by one taxpayer on behalf of himself or herself and others similarly situated to recover back taxes.[35] We further explained:

---

[31] *The State v. Stout, supra* note 16.

[32] *Boersma v. Karnes*, 227 Neb. 329, 332, 417 N.W.2d 341, 344 (1988).

[33] *Id.*

[34] See Neb. Rev. Stat. §§ 77-2793 and 77-2795 (Reissue 2003).

[35] *Boersma v. Karnes, supra* note 32. See, also, *Hansen v. County of Lincoln*, 188 Neb. 461, 197 N.W.2d 651 (1972); *State ex rel. Sampson v. Kenny*, 185 Neb. 230, 175 N.W.2d 5 (1970); *Monteith v. Alpha High School District*, 125 Neb. 665, 251 N.W. 661 (1933).

"It is clearly the policy of the Legislature in setting up a refund statute to require individual action. Taxes ordinarily paid under a mistake of law are not recoverable, and the refund statute gives special relief in this situation. . . ."

Neb. Rev. Stat. § 77-2793 (Reissue 1986) provides a procedure by which a taxpayer may obtain a refund of an overpayment of income taxes. This statutory procedure is exclusive and does not provide for class actions.[36]

Other states have reached similar conclusions in tax cases because their statutes require that taxpayers bring refund claims individually using a specific procedure.[37] But in cases outside the tax refund context, courts have permitted class actions without an express waiver.[38]

In *Oda v. State*,[39] the Washington Court of Appeals addressed whether the legislature had waived sovereign immunity in class actions against the state. There, the court recognized that class actions were not permitted in tax cases without express authorization.[40] The court contrasted the waiver provided in its tax refund statute with the waiver of immunity in tort actions, stating: "Neither [the statute waiving immunity in tort actions] nor any other statute dictates a specific format for a tort action against the State comparable to the limitations with which the Legislature has circumscribed the initiation of an excise tax refund appeal."[41] The court held that its waiver—which provided that the state was liable in tort actions to the same extent as private persons—was broad enough to permit class actions.[42]

---

[36] *Boersma v. Karnes, supra* note 32, 227 Neb. at 331-32, 417 N.W.2d at 344, quoting *State ex rel. Sampson v. Kenny, supra* note 35.

[37] See, *Lick v. Dahl*, 285 N.W.2d 594 (S.D. 1979); *Charles v. Spradling*, 524 S.W.2d 820 (Mo. 1975).

[38] See, *Board of Regents, University System v. Rux*, 260 Ga. App. 760, 580 S.E.2d 559 (2003); *Oda v. State*, 111 Wash. App. 79, 44 P.3d 8 (2002).

[39] *Oda v. State, supra* note 38.

[40] *Id.*, citing *Lacey Nursing v. Dep't of Revenue*, 128 Wash. 2d 40, 905 P.2d 338 (1995).

[41] *Oda v. State, supra* note 38, 111 Wash. App. at 85-86, 44 P.3d at 11.

[42] *Id.*

Here, § 25-21,206 waives immunity over the Officers' claims, so we look to that statute to determine whether it also waives immunity in class actions. Section 25-21,206 waives the state's immunity in contract actions, providing:

> The state may be sued in the district court of the county wherein the capital is situated in any matter founded upon or growing out of a contract . . . . [T]he rules of pleading and practice in regard to other civil actions in the district court shall be observed in all actions by or against the state, as far as applicable except as otherwise herein provided.

▓▓ While the waiver of sovereign immunity in § 25-21,206 does not specifically mention class actions, we conclude that it is broad enough to encompass class actions. Unlike the tax refund statutes,[43] § 25-21,206 does not limit the procedure for contract claims against the State so that only individual actions are permitted. We conclude that the holding in *Boersma*[44] is limited to tax refund cases. The district court did not err in permitting the Officers' lawsuit to proceed as a class action.

## 2. RETIREMENT COMPUTATION

The Officers assert two theories to support their argument that the Appellants improperly computed their retirement benefits: (1) the Appellants acted contrary to statute in entering the bargaining agreement reducing their sick leave and (2) the Appellants unconstitutionally impaired the Officers' contract rights.

## (a) § 81-1377(2)

The Officers contend that the bargaining agreement entered on their behalf, which reduced the amount of sick leave they could earn each year, violates statutory authority. The State Employees Collective Bargaining Act permits bargaining between the State and bargaining units composed of state employees. Section 81-1371(9) provides that terms of employment may be bargained over "except when specifically prohibited by law from being a subject of bargaining." Section 81-1377(2) prohibits bargaining over retirement programs. The Officers argue that the amount of sick leave hours to which they are entitled is part of the retirement

---

[43] See Neb. Rev. Stat. §§ 77-2793 to 77-27,101 (Reissue 2003).

[44] *Boersma v. Karnes, supra* note 32.

program and is not bargainable under § 81-1377(2). The district court agreed with the Officers, finding that 240 hours of sick leave—as represented to the Officers when they were hired—is an integral part of the retirement program.

The Legislature has not defined the term "retirement program." The Officers cite *Calabro v. City of Omaha*[45] in support of their contention that their retirement program includes a specific number of sick leave hours for calculating their annuities. In *Calabro*, we addressed whether a supplemental benefit plan that provided a cost-of-living increase to retirees' pension payments constituted a constitutionally protected pension or a gratuity. We held that the supplemental plan was a pension because it was "directly related to the pension plan . . . since in order to receive the supplemental benefit, the employee had to qualify for the . . . plan."[46] The Officers argue that the accrual of 240 hours of sick leave is "part and parcel" of the annuity calculation under their retirement program, as was the supplemental plan in *Calabro*.[47] The Officers also contend this demonstrates that "the Nebraska Supreme Court views 'retirement benefits' to encompass more than just pension annuities."[48]

*Calabro* is not helpful to the Officers' case. In contrast to the supplemental benefit plan in *Calabro*, the sick leave provision is not directly related to the retirement program. The sick leave provisions have a purpose completely unrelated to the retirement plan. Sick leave permits employees to be absent from work for various reasons related to illness throughout the year.

Although unused sick leave hours included in the retirement calculation do affect the annuity, the specific number of hours does not constitute a retirement program under § 81-1377(2). The number of hours is a variable used to calculate the annuity. Many factors similarly affect the amount of the annuity. Wages, for example, like sick leave hours, affect the retirement calculation. But common sense suggests that wages would not be considered as a retirement program, thus prohibiting bargaining over wages.

---

[45] *Calabro v. City of Omaha*, 247 Neb. 955, 531 N.W.2d 541 (1995).

[46] *Id.* at 963, 531 N.W.2d at 548.

[47] See *id.* at 964, 531 N.W.2d at 549.

[48] Brief for appellees at 11.

The specific number of sick leave hours is no more a part of the Officers' retirement program than their salaries.

Further, the Nebraska State Patrol Retirement Act does not make 240 hours a part of the Officers' retirement program. Instead, § 81-2026(1)(c) simply requires that unused sick leave be included, without specifying at what rate. The Nebraska State Patrol informed the Officers that they would receive 240 hours of sick leave per year and that their retirement calculations would include unused sick leave. But the record shows that these representations were independent and did not cause 240 hours of sick leave to become an integral part of the retirement program. We conclude that the Appellants did not bargain the Officers' retirement program by reducing the sick leave the Officers could receive.

### (b) Contract Rights

The Officers contend that they have a contractual right to have up to 240 hours of sick leave included in their annuity calculation. The district court did not reach this issue because it resolved the Officers' claims under § 81-1377(2). But the Officers did raise the argument, and we address it on appeal. They argue that by reducing the unused sick leave included in their retirement calculation, the Appellants impaired their contract rights. The Appellants, however, contend that the Officers agreed to the change through the labor agreement entered into on their behalf.

■ An employee who relies upon an offer of deferred benefits to his or her detriment, and to the benefit of the employer who gains the employee's valuable services and loyalty as a consequence thereof, has expectations protected by contract law.[49] In *Halpin v. Nebraska State Patrolmen's Retirement System*,[50] we determined that officers employed by the Nebraska State Patrol on or before January 4, 1979, have a contractual right to the inclusion of unused sick leave in their retirement calculations. Until January 4, Nebraska State Patrol representatives informed officers that their final monthly salary would be calculated by including unused leave payments. But thereafter, the retirement

---

[49] *Halpin v. Nebraska State Patrolmen's Retirement System, supra* note 1.

[50] *Id.*

system stopped including these payments.[51] We noted that this was done "without an offsetting increase in benefits."[52] We held that the practice of including the leave payments "gave rise to legitimate expectations on the part of the plaintiffs and the plaintiffs [had] a vested right to have this practice continued as to them."[53]

Similarly, in *Omer v. Tagg*,[54] when the plaintiff was hired, he was promised that upon retirement, he could continue participating in the state's group health insurance coverage. The Legislature later passed a statute which made the plaintiff ineligible for the group insurance program upon retirement. This court upheld the rule in *Halpin* and concluded that "the promises made at the time of employment were for compensation to be enjoyed at retirement and constituted a contract enforceable against the State."[55]

The Officers here likewise contend that they have a legitimate expectation in having 240 hours of sick leave, rather than 108 hours, included in the retirement calculation. Upon hiring, Nebraska State Patrol representatives informed the Officers that they would receive 240 hours of sick leave per year and that one-fourth of the unused sick leave they accumulated during their last 3 years of employment would be included in computing their retirement annuity. The Officers relied on these representations when accepting employment. The Officers believed that 240 hours of sick leave per year was the amount their retirement benefits would be based on.

Here, the Officers did have contractual rights to 240 hours of sick leave per year when they began their employment with the Nebraska State Patrol, as represented when they were hired. But, there is a critical distinction from *Halpin* and *Omer*. In those cases, the State unilaterally took away benefits it had promised to the plaintiffs. The reduction was part of a bargaining agreement. The provision for 108 hours of sick leave became part

---

[51] *Id.*

[52] *Id.* at 899, 320 N.W.2d at 914.

[53] *Id.* at 901, 320 N.W.2d at 915.

[54] *Omer v. Tagg, supra* note 20.

[55] *Id.* at 530, 455 N.W.2d at 817.

of a contract, bargained for on behalf of the Officers by the Law Enforcement Bargaining Council.

▮ Not every change in a contract constitutes an impairment under the Nebraska Constitution. The change must take something away and not work to the parties' benefit. Absent such a showing, no proof of any impairment exists.[56] The change to sick leave occurred in a bargained-for contract, agreed upon after negotiations took place—not a unilateral decision of the State or its agency. The contract entered on behalf of the Officers was valid and binding on them. We conclude that the Appellants did not unconstitutionally impair the Officers' contract.

## V. CONCLUSION

The district court had jurisdiction to hear the Officers' claims. Section 25-21,206 permitted the Officers to file suit in this retirement benefits dispute in the district court without presuit filing requirements. And the Officers properly presented their lawsuit as a class action against the State.

But the district court erred in finding that 240 hours of unused sick leave was part of the Officers' retirement program. Further, the Appellants did not impair the Officers' contract when they changed the sick leave provision in the 1993 bargaining agreement. Accordingly, we reverse the decision of the district court ordering the Appellants to recalculate the Officers' retirement annuities. Because we reverse, we do not need to consider the Officers' arguments on cross-appeal.

REVERSED.

HEAVICAN, C.J., not participating.

---

[56] See *Bauers v. City of Lincoln*, 255 Neb. 572, 586 N.W.2d 452 (1998).